## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TARRIQUE BROOKS-BEY and WADNER BRIZEUS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>     v.<br><br>RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, QUEST GLOBAL SERVICES-NA, INC., BELCAN LLC, CYIENT, INC., PARAMETRIC SOLUTIONS, INC., AGILIS ENGINEERING, INC., MAHESH PATEL, ROBERT HARVEY, HARPREET WASAN, STEVE HOUGHTALING, THOMAS EDWARDS, GARY PRUS, FRANK O'NEILL, CO-CONSPIRATOR 2, CO-CONSPIRATOR 4, AND DOES 1-50.<br><br>Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    EFFECTS ON INTERSTATE COMMERCE ..................................................... 6

IV.     PARTIES ............................................................................................................ 6

        A.     Plaintiffs ................................................................................................. 6

        B.     Pratt & Whitney Defendants ................................................................. 7

        C.     QuEST Global Defendants .................................................................... 8

        D.     Belcan Defendants .............................................................................. 10

        E.     Cyient Defendants ............................................................................... 11

        F.     Parametric Solutions Defendants ....................................................... 12

        G.     Agilis Engineering Defendants ........................................................... 13

        H.     Doe Defendants .................................................................................... 13

        I.     Agents and Co-Conspirators ............................................................... 14

V.      FACTUAL ALLEGATIONS ........................................................................... 14

        A.     Defendants' Conspiracy ...................................................................... 14

        B.     The Conspiracy Began in 2011 ........................................................... 15

        C.     Restricting Hiring and Recruiting Between Suppliers ................................. 16

        D.     Defendant Mr. Patel, of Defendant Pratt & Whitney, Orchestrated and
               Enforced the No-Poach Agreement .................................................... 17

        E.     The Express Purpose of the No-Poach Agreement Was to Suppress
               Compensation to Defendants' Skilled Aerospace Workers ........................ 20

        F.     Defendants Knew Their Conduct Was Unlawful ....................................... 21

        G.     Restricting Hiring and Recruiting Between Pratt & Whitney and QuEST .. 22
               1.   Two-Year Tenure Restriction ................................................... 22
               2.   Hiring Freezes ......................................................................... 24

        H.     Affected Individuals and Anticompetitive Effects Suffered by Class
               Members ............................................................................................... 25

        I.     The Compensation Structures for Defendants' Unionized Employees
               Contributed to the Common Impact of Defendants' Conspiracy ................ 31

        J.     Plaintiffs' Claims Are Timely Because Defendants Fraudulently Concealed
               the Conspiracy ...................................................................................... 33

VI.     CLASS ACTION ALLEGATIONS .................................................................. 35

FIRST CLAIM FOR RELIEF ...................................................................................... 37

i

PRAYER FOR RELIEF ...................................................................................................... 38

JURY DEMAND................................................................................................................. 39

Plaintiffs Tarrique Brooks-Bey and Wadner Brizeus ("Plaintiffs") allege as follows:

I.    **INTRODUCTION**

1.       This civil antitrust action seeks treble damages and injunctive relief on behalf of a proposed Class of aerospace engineers and other skilled-labor employees whose wages were unlawfully suppressed by Defendants who agreed to restrict the hiring and recruiting of such skilled employees between and among their respective companies.  This "no poach" agreement was made by some of the largest aerospace engineering firms in the United States and maintained from at least 2011 through 2019.

2.       The conspiracy was orchestrated and enforced by Defendant Raytheon Technologies Corporation, Pratt & Whitney division ("Pratt & Whitney"), one of the nation's leading aerospace engine design, manufacture, service, and supply companies and five conspiring outsource engineer supplier companies ("Supplier Defendants") to restrain competition and reduce compensation for their employees.  Plaintiffs are aerospace, mechanical, and civil engineers and other high-skilled workers performing services such as engineering design, testing, software development, supply chain management, and project management for commercial and military aircraft ("Skilled Aerospace Workers").[1]

3.       All Defendants shared a common interest achieved via the "no poach" agreement and unfairly profited at the expense of their Skilled Aerospace Workers whose mobility and compensation was suppressed.  Defendant Pratt & Whitney further benefited by not only suppressing the compensation of its own workers, but also paying employees of the Supplier Defendants less than they would have if those entities had competitive cost structures.  Indeed, the United States Department of Justice ("DOJ"), in a related criminal proceeding, described the conspiracy as one victimizing "thousands of workers" wrought by "corporate executives [who] undermine the careers of their own workers in order to reap undeserved profits and deprive our fellow citizens of opportunities to earn a competitive wage."

---

[1] The Class may be further defined with reference to specific job titles upon Plaintiffs' analysis of discovery materials.

4.      On December 9, 2021, the DOJ publicly revealed the conspiracy by announcing the indictment of Defendant Mahesh Patel, a Manager and Director of a unit within Defendant "Company A" (identified below as Pratt & Whitney) in charge of managing the relationship between Pratt & Whitney and its suppliers.  *See* Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-01189-RAR-1 (D. Conn. filed Dec. 9, 2021) ("*Patel* Affidavit").  On December 15, 2021, the DOJ revealed a grand jury indictment against Mr. Patel and five of his co-conspirators, Robert Harvey, Harpreet Wasan, Steven Houghtaling, Tom Edwards, and Gary Prus.  *See* Indictment, *United States v. Patel*, No. 3:21-cr-00220-VAB (D. Conn. filed Dec. 15, 2021), Dkt. 20 ("DOJ Indictment").

5.      The DOJ alleges that, by 2011, Defendants Patel, Harvey, Wasan, Houghtaling, Edwards, and Prus, and unindicted co-conspirator companies and individuals, orchestrated a conspiracy in which they agreed with one another to restrict the hiring and recruiting of skilled-labor between and among Companies A-F in the United States.  Defendants and their co-conspirators attended meetings and engaged in discussions between and among themselves concerning restricting the hiring and recruiting of Skilled Aerospace Workers in the United States. They further agreed during those meetings and discussions to restrict the hiring and recruiting of Skilled Aerospace Workers between and among Companies B-F, including by not hiring employees of Companies B-F and not proactively contacting, interviewing, or otherwise recruiting potential applicants to Companies B-F who were employed by another co-conspirator.

6.      The *Patel* Affidavit identifies "Company A" as one of the "largest aerospace engine design, manufacture, and service companies in the United States," and details actions in furtherance of the conspiracy by Patel, who "was the Manager and (later) Director of the unit within Company A in charge of managing the relationship between Company A and its suppliers."  *Id*. ¶¶ 2, 10.  Upon information and belief, "Company A" refers to Defendant Raytheon Technologies Company, Pratt & Whitney division, the company where Patel worked during the Class Period.  This Complaint uses "Pratt & Whitney" or "Pratt" where the *Patel* Affidavit uses "Company A."

7.    Upon information and belief, "Company B" refers to QuEST Global Services-NA, Inc.  This Complaint uses "QuEST Global" or "QuEST" where the *Patel* Affidavit uses "Company B."

8.    Upon information and belief, Co-Conspirator 1 in the *Patel* Affidavit refers to Defendant Robert Harvey, an employee of QuEST Global.  The DOJ Indictment confirms Mr. Harvey's identity.

9.    Upon information and belief, Co-Conspirator 3 in the *Patel* Affidavit refers to Defendant Harpreet Wasan, a former employee of QuEST Global.  The DOJ Indictment confirms Mr. Wasan's identity.

10.    Upon information and belief, "Company C' refers to Belcan LLC.  This Complaint uses "Belcan" where the *Patel* Affidavit uses "Company C."

11.    Upon information and belief, Co-Conspirator 5 in the *Patel* Affidavit refers to Steve Houghtaling, an employee of Belcan.  The DOJ Indictment confirms Mr. Belcan's identity.

12.    Upon information and belief, "Company D" refers to Defendant Cyient, Inc., a multinational engineering company.  This Complaint uses "Cyient" where the *Patel* Affidavit uses "Company D."

13.    Upon information and belief, Co-Conspirator 6 in the *Patel* Affidavit refers to Defendant Thomas Edwards, a former employee of Cyient.  The DOJ Indictment confirms Mr. Edwards' identity.

14.    Upon information and belief, "Company E" refers to Parametric Solutions, Inc. This Complaint uses "Parametric" where the *Patel* Affidavit uses "Company E."

15.    Upon information and belief, Co-Conspirator 7 in the *Patel* Affidavit refers to Defendant Gary Prus, an employee of Parametric.  The DOJ Indictment confirms Mr. Prus' identity.

16.    Upon information and belief, "Company F" refers to Defendant Agilis Engineering, Inc.  This Complaint uses "Agilis" where the *Patel* Affidavit uses "Company F."

17.     Upon information and belief, Co-Conspirator 8 in the *Patel* Affidavit refers to Defendant Frank O'Neill, an employee of Agilis.  This Complaint uses "Frank O'Neill" where the *Patel* Affidavit uses "Co-Conspirator 8."

18.     Pratt competes with the Defendants, Pratt's Suppliers, to hire and retain employees throughout the United States.  All Defendants employ persons with experience or skills valued in the aerospace engineering industry.  Beginning no later than 2011, however, Defendants or their predecessors in interest entered into agreements to avoid competing for Skilled Aerospace Workers by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their current employers.  These "no-poach" agreements continued through at least 2019.  The CEOs and other senior executives of each co-conspirator monitored and enforced the agreements.

19.     The conspiracy was not necessary to any legitimate business transaction or lawful collaboration among the companies.  Instead, it was an effective tool to suppress their employees' mobility and compensation, and hence unlawfully reduce the Defendants' costs.  Pratt's incentive was to reduce the cost of contracts with each of its suppliers by helping those suppliers reduce their labor costs.  Pratt did so by orchestrating and enforcing a horizontal agreement between and amongst the suppliers not to compete for labor.

20.     The conspiracy accomplished its purpose.  It reduced competition for Defendants' employees and suppressed the compensation of Defendants' employees below competitive levels.  The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, current and prospective employees.

21.     Defendants' conspiracy also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment.  In addition, Defendants' conspiracy eliminated the need for compensation increases to preempt competitive offers and retain employees.  The result, by design, was suppression of broad employee pay structures.

## II.    **JURISDICTION AND VENUE**

20.     This action arises under section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15(a)).  Plaintiffs seek injunctive relief and the recovery of treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class (defined below) sustained because of Defendants' anticompetitive conduct.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15 and 26.

21.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the proposed Class Period (defined below), Defendants resided, transacted business, were found, or had agents in this District, and Defendants carried out a substantial portion of the activity that affected interstate trade and commerce in this District.

22.     During the Class Period, Defendants assessed, hired, and retained employees in a continuous and uninterrupted flow of interstate commerce, including in this District.  Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

23.     This Court has personal jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries: (a) transacted business throughout the United States, including in this District; (b) participated in the assessment, hiring, and retention of employees throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

24.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the

Class.  Defendants, directly and through their agents, engaged in activities to limit competition and fix, maintain, and/or stabilize the compensation and terms of employment of their employees in the United States, which unreasonably restrained trade and adversely affected competition in the market for the services of their employees.

### III.   EFFECTS ON INTERSTATE COMMERCE

25.     During the Class Period, Defendants employed Plaintiffs and other Class members throughout the United States, including significant presences in at least Connecticut, Georgia, Florida, Illinois, Kentucky, Massachusetts, Puerto Rico, and Vermont.

26.     Defendants and states compete to attract Skilled Aerospace Workers and such competition is nationwide. Defendants considered each other's wages to be competitively relevant regardless of location and many Class members were prevented by Defendants' scheme from moving between states to pursue employment.

27.     Defendants' conspiracy substantially reduced competition for Skilled Aerospace Workers and suppressed the efficient movement and compensation of aerospace-engineering industry employees, harming Plaintiffs and members of the Class.  Because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally, the harm extended not only to those who sought, or otherwise would have sought to change companies, but also to those who had no intention of seeking other employment.

28.     Thus Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

### IV.   PARTIES

#### A.   Plaintiffs

29.     Plaintiff Tarrique Brooks-Bey was employed by Defendant QuEST Global as a Project Engineer – EVMS Analyst from approximately March 2015 to June 2016.  Mr. Brooks-Bey was employed in the East Hartford, Connecticut area and is a citizen and resident of the State

of Connecticut.  Mr. Brooks-Bey was injured in his business and property by reason of Defendants' conspiracy alleged herein.

30.     Plaintiff Wadner Brizeus was employed by Defendant QuEST Global from September 2013 to May 2017.  He worked as a Project Engineer – Project Management from September 2013 to September 2014, as a Project Engineer – Test Equipment Logistics from April 2014 to August 2015, and as a Project Engineer – Program Management EVMS Analyst from September 2014 to May 2017.  Mr. Brizeus was employed in the East Hartford, Connecticut area, and currently is a citizen and resident of the State of New Jersey.  Mr. Brizeus was injured in his business and property by reason of Defendants' conspiracy alleged herein.

**B.    Pratt & Whitney Defendants**

31.     Defendant Raytheon Technologies Corporation, Pratt & Whitney division is a company organized and existing under the laws of Delaware.  Raytheon Technologies Corporation's principal executive offices are in Waltham, Massachusetts and Pratt & Whitney's corporate headquarters are in East Hartford, Connecticut.  During the relevant period, Pratt participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.  Upon information and belief, Pratt is the company identified as "Company A" in the *Patel* Affidavit.

32.     Pratt & Whitney is one of the "big three" aero-engine manufacturers, competing with General Electric and Rolls Royce to power commercial and defense aircraft such as the Airbus A320neo and the F-35 combat jet.  Pratt employs approximately 39,000 employees, and in 2020 earned approximately $16.8 billion USD in revenue.  Defendant Pratt & Whitney was a division of United Technologies Corporation until it merged with Raytheon Company in April 2020 and has been a division of Raytheon Technologies Corporation since.

33.     Defendant Mahesh Patel is a natural person and resident of Connecticut.  He worked as Manager and (later) Director of the unit within Pratt in charge of managing the relationships between Pratt and its Suppliers.  Within that unit, he was the highest-ranking employee, and managed a team of associates from his office in East Hartford, Connecticut.  Mr.

7

Patel and his associates frequently communicated with representatives of the Suppliers, controlled the retention, scope of work, and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Pratt & Whitney.  Mr. Patel was also involved in master contract negotiations between Suppliers and Raytheon Technologies Corporation, which provided for maximum pricing for each Supplier to Pratt.  Mr. Patel left his employment at Pratt in March 2020.

34.    Mr. Patel participated in, ordered, authorized, and assumed a direct role in the illegal conduct alleged.  He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well.  When engaged in the actions set forth in this complaint, Mr. Patel was acting on behalf of Pratt while engaged in the company's management, direction, or control, or transaction of its business or affairs.  During the relevant period, Mr. Patel participated in the conspiracy and committed overt acts in furtherance thereof.

C.    **QuEST Global Defendants**

35.    Defendant QuEST Global Services-NA, Inc. (hereinafter "QuEST Global") is a company organized and existing under the laws of Ohio, with its principal place of business in East Hartford, Connecticut.  During the relevant period, QuEST Global participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.  Upon information and belief, QuEST Global is the company identified as "Company B" in the *Patel* Affidavit.

36.    QuEST Global is a Supplier to Pratt.  It is a global product engineering company that supplies several industries, including the aerospace, automotive, energy, medical devices, and rail industries.  QuEST Global's 2021 fiscal year revenues were $600 million, and it has approximately 12,800 employees spread across thirteen international delivery centers.  In 2017, QuEST Global opened offices in downtown Middletown, Connecticut to be closer to Pratt's Middletown campus.

37.     Defendant Robert Harvey is a natural person and resident of Connecticut.  Mr. Harvey has been the President-Global Business Head of QuEST Global since 2019 and is based in East Hartford, Connecticut.  Mr. Harvey served as QuEST Global's Senior Vice President from 2010 to 2014.  Thereafter, he served as President-Strategic Accounts at QuEST Global from 2014 to 2019.

38.     Mr. Harvey knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Harvey was acting on behalf of QuEST Global while engaged in the company's management, direction, or control, or transaction of its business or affairs.  He had substantial responsibilities on behalf of QuEST Global to maintain and advance his employer's business relationship with Pratt, and substantial responsibilities with respect to the management of hiring and recruiting at QuEST Global.  Mr. Harvey had communications with Mr. Patel and other co-conspirators on these subjects.  Upon information and belief, Mr. Harvey is the individual identified as "Co-Conspirator 1" in the *Patel* Affidavit.  His identity is confirmed in the DOJ Indictment.

39.     Defendant Co-Conspirator 2 was employed by QuEST Global at least as early as 2007.  He served as Engineering director, General Manager starting in 2011 and in 2015 became Associate Vice President.  He worked principally from an office in East Hartford, Connecticut.

40.     Defendant Harpreet Wasan is a natural person and resident of Connecticut.  Mr. Wasan began working at QuEST Global in 2015 as the company's Vice President – AeroEngines/Strategic Client Partner.  His job was based in Hartford, Connecticut.  Between 2017 and 2019, Mr. Wasan began to serve as QuEST Global's Vice President of the Asia Pacific Region, and was based in Tokyo, Japan.  Mr. Wasan left QuEST Global in January 2021.

41.     Mr. Wasan knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Wasan was acting on behalf of QuEST Global while engaged in the company's management, direction, or control, or transaction

of its business or affairs.  He had substantial responsibilities on behalf of QuEST Global to maintain and advance his employer's business relationship with Pratt, and substantial responsibilities with respect to the management of hiring and recruiting at QuEST Global.  Mr. Wasan had communications with Mr. Patel and other co-conspirators on these subjects.  Upon information and belief, Mr. Wasan is the individual identified as "Co-Conspirator 3" in the *Patel* Affidavit.  His identity is confirmed in the DOJ Indictment.

42.     Defendant Co-Conspirator 4 began working for QuEST Global as a General Manager in late 2015.  In 2018, he became a Chief Engineer/Account Manager.  He worked principally from offices in East Hartford and Windsor, Connecticut.  He left the company in 2020.

**D.     Belcan Defendants**

43.     Defendant Belcan LLC is a company organized and existing under the laws of Ohio, with its principal place of business in Windsor, Connecticut.  During the relevant period, Belcan participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

44.     Belcan LLC is a Supplier to Pratt.  It offers design, engineering, and staffing solutions for the aerospace and defense industries.  Belcan's revenue is reported at $739.63 million and it has approximately 10,000 employees worldwide.  In 2017, Belcan opened offices in downtown Middletown, Connecticut to be closer to Pratt's Middletown campus.

45.     Defendant Steve Houghtaling is a natural person and resident of Connecticut.  In 2013, he began working for Belcan as a General Manager, and was promoted to Vice President in 2015.  Since 2019, he has served as Belcan's Senior Vice President, working primarily from an office in Windsor, Connecticut.

46.     Mr. Houghtaling knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well.  When engaged in the actions set forth in this complaint, Mr. Houghtaling was acting on behalf of Belcan while engaged in the company's management, direction, or control, or transaction

of its business or affairs.  He had substantial responsibilities on behalf of Belcan to maintain and advance his employer's business relationship with Pratt, and substantial responsibilities with respect to the management of hiring and recruiting at Belcan.  Mr. Houghtaling had communications with Mr. Patel and other co-conspirators on these subjects.  Upon information and belief, Mr. Houghtaling is the individual identified as "Co-Conspirator 5" in the *Patel* Affidavit. His identity is confirmed in the DOJ Indictment.

### E.    <u>Cyient Defendants</u>

47.    Defendant Cyient, Inc. ("Cyient") is a company organized and existing under the laws of California with its principal place of business in East Hartford, Connecticut.  Prior to 2014, Cyient was known as Infotech Enterprises Ltd.  Upon information and belief, Cyient is the company identified as "Company D" in the *Patel* Affidavit.  During the relevant period, Cyient participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

48.    Cyient is a Supplier to Pratt.  Cyient is a global digital engineering and technology company and employs individuals to operate its business at its headquarters location and at other locations throughout the United States.  Cyient reported its 2018 fiscal year revenue as $570 million and it has approximately 10,000 employees worldwide.  In 2017, Cyient opened offices in downtown Middletown, Connecticut to be closer to Pratt's Middletown campus.

49.    Defendant Thomas Edwards is a natural person and resident of Connecticut, and is currently based in New Fairfield, Connecticut.  Mr. Edwards was the President of Cyient's North American Operations from 2013 to 2014, and worked principally from an office in East Hartford, Connecticut.  Prior to that, Mr. Edwards served as Cyient's Vice President of Engineering, Aerospace from July 2010 to March 3013.

50.    Mr. Edwards knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well.  When engaged in the actions set forth in this complaint, Mr. Edwards was acting on behalf of Cyient while engaged in the company's management, direction, or control, or transaction of its

business or affairs. He had substantial responsibilities on behalf of Cyient to maintain and advance his employer's business relationship with Pratt, and substantial responsibilities with respect to the management of hiring and recruiting at Cyient. Mr. Edwards had communications with Mr. Patel and other co-conspirators on these subjects. Upon information and belief, Mr. Edwards is the individual identified as "Co- Conspirator 6" in the *Patel* Affidavit. His identity is confirmed in the DOJ Indictment.

F.     **Parametric Solutions Defendants**

51.     Defendant Parametric Solutions, Inc. is a company organized and existing under the laws of Florida, with its principal place of business in Jupiter, Florida. Upon information and belief, Parametric is the company identified as "Company E" in the *Patel* Affidavit. During the relevant period, Parametric participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

52.     Parametric is a Supplier to Pratt. Parametric's recent revenue exceeded $41.79 million and it has approximately 300 employees worldwide.

53.     Defendant Gary Prus is a natural person and resident of Florida. He is currently the Chief Operating Officer of Parametric.

54.     Mr. Prus knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Prus was acting on behalf of Parametric while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial responsibilities on behalf of Parametric to maintain and advance his employer's business relationship with Pratt, and substantial responsibilities with respect to the management of hiring and recruiting at Parametric. Mr. Prus had communications with Mr. Patel and other co-conspirators on these subjects. Upon information and belief, Mr. Prus is the individual identified as "Co-Conspirator 7" in the *Patel* Affidavit. His identity is confirmed in the DOJ Indictment.

12

G.     **Agilis Engineering Defendants**

55.     Defendant Agilis Engineering, Inc. is a company organized and existing under the laws of Florida, with its principal place of business in Palm Beach Gardens, Florida.  Upon information and belief, Agilis is the company identified as "Company F" in the *Patel* Affidavit.  During the relevant period, Agilis participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

56.     Agilis is a Supplier to Pratt & Whitney.  Agilis has a reported revenue of $3.28 million and it has approximately 41 employees worldwide.

57.     Defendant Frank O'Neill is a natural person and resident of Florida.  He has served as Agilis's President and CEO since 1993.

58.     Mr. Prus knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well.  When engaged in the actions set forth in this complaint, Mr. O'Neill was acting on behalf of Agilis while engaged in the company's management, direction, or control, or transaction of its business or affairs.  He had substantial responsibilities on behalf of Agilis to maintain and advance his employer's business relationship with Pratt, and substantial responsibilities with respect to the management of hiring and recruiting at Agilis.  Mr. O'Neill had communications with Mr. Patel and other co-conspirators on these subjects.  Upon information and belief, Mr. O'Neill is the individual identified as "Co-Conspirator 8" in the *Patel* Affidavit.

H.     **Doe Defendants**

59.     Upon information and belief, Does 1-50, which include Co-Conspirator 2 and Co- Conspirator 4 in the *Patel* Affidavit and described above, are persons and entities that participated in the conspiracy between and among Defendants as yet unnamed or unidentified co-conspirators or participants in the conspiracy.  During the relevant period, Does 1-50 participated in the conspiracy and, through their executives, managers, employees, or agents, committed overt acts in furtherance thereof.

I.      **Agents and Co-Conspirators**

60.     The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

61.     The Defendants' agents operated under the explicit and apparent authority of their principals.

62.     Each Defendant operated through its subsidiaries, affiliates, and agents.

63.     Each Defendant acted as the principal, agent, or joint venture partner of or for other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

64.     Upon information and belief, various companies and individuals not named as defendants in this Complaint participated as co-conspirators in the alleged conspiracy and performed acts and made statements to further the conspiracy.

V.      **FACTUAL ALLEGATIONS**

A.      **Defendants' Conspiracy**

65.     Pratt & Whitney is a designer, manufacturer, and service provider of aircraft engines and auxiliary power units.  Pratt relied upon both internal and external sources of labor to design, manufacture, and service its aerospace products, including through outsource engineering.  In an outsource arrangement, an outsource engineering supply company ("Supplier") entered into an agreement with Pratt to complete a particular project, often referred to as a Statement of Work.  The Supplier then assigned Skilled Aerospace Workers from among its own employees to complete that project, and then received an agreed-upon payment from Pratt for such work.  QuEST Global, Belcan, Cyient, Parametric, and Agilis are Pratt's Suppliers.

66.     Together with Pratt, QuEST Global, Belcan, Cyient, Parametric, and Agilis competed against one another to recruit and hire Skilled Aerospace Workers.  As Suppliers, they

also competed against one another for outsource work projects from Pratt, including on the basis of (low) price.

67.     Increases in labor costs due to increased wage or benefits to Skilled Aerospace Workers affected both the Suppliers and Pratt.  If a Supplier increased wages or benefits, including as a means of attracting and retaining workers, that Supplier's total labor costs increased.  This resulting increase in labor costs would have required the Supplier to quote or seek to charge higher prices (or "rates") to Pratt, given that a Supplier's rate for its work on a particular Pratt project was based primarily on per-hour prices for the labor to be performed by the Supplier's employees.  Labor costs were thus closely monitored by each of the Suppliers and by Patel on behalf of Pratt; QuEST Global, Belcan, Cyient, Parametric, and Agilis each had an interest in minimizing or reducing labor cost increases.

68.     Over a period spanning at least the years 2011 through September 2019, Pratt, QuEST Global, Belcan, Cyient, Parametric, and Agilis joined a conspiracy to reduce and limit compensation and mobility of Skilled Aerospace Workers.  In furtherance of the conspiracy, Defendants, and each of them, entered into an employee allocation agreement to eliminate competition between and among themselves for employees, focusing on the recruiting of Skilled Aerospace Workers.  The conspiracy was executed, enforced, and concealed by the companies' most senior executives and managers.  This no-poach agreement was not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

69.     Defendants participated in meetings, conversations, and communications to discuss the solicitation and hiring of each other's Skilled Aerospace Workers, and agreed during those meetings, conversations, and communications not to solicit or hire each other's Skilled Aerospace Workers.

**B.     The Conspiracy Began in 2011**

70.     The conspiracy began at least as early as 2011, when Mr. Patel, Pratt & Whitney, and others, including, over the course of the conspiracy, Mr. Harvey, Mr. Wasan, Mr. Edwards,

Mr. Prus, Mr. Neill, and Co-Conspirators 2 and 4, and QuESt Global, Belcan, Cyient, Parametric, and Agilis, agreed to allocate employees in the labor market in the aerospace industry, specifically by agreeing to restrict the hiring and recruiting of Skilled Aerospace Workers between and among Pratt, QuESt Global, Belcan, Cyient, Parametic, and Agilis in the United States. Furthermore, Mr. Patel served as a leader and primary enforcer of this agreement.

71.     This agreement manifested itself in interwoven and overlapping hiring and recruiting restrictions, with Mr. Patel serving as a central coordinator. These restrictions had a common purpose—to limit competition for, and thus restrict the free movement of, employees within the aerospace outsource engineering industry—and thus artificially prolonged employees' tenures at their existing employers and eliminated or reduced their ability to negotiate the terms of their current or future employment. Furthermore, these restrictions were shaped by the conspirators' shared financial motivations, namely, to reduce labor costs by suppressing wages.

### C.     Restricting Hiring and Recruiting Between Suppliers

72.     Mr. Patel participated in an agreement between QuEST Global, Belcan, Cyient, Parametric, and Agilis not to recruit and hire each other's Skilled Aerospace Workers, with the aid of several of their managers and executives, including Mr. Harvey, Mr. Wasan, Mr. Edwards, Mr. Prus, Mr. O'Neill, and Co-Conspirators 2 and 4. Mr. Patel served as leader and chief enforcer of the agreement between and among Suppliers, due to his position and influence at Pratt & Whitney, their common customer.

73.     The origin of this agreement lies in the common interest of Suppliers and Pratt to restrict the movement of employees from Supplier to Supplier, which movement resulted in increased wages. Beginning as early as 2011, certain Suppliers who shared Pratt as a mutual customer reached agreements to restrict the hiring and recruiting of Skilled Aerospace Workers between and among them.

74.     Around the same time, evidence shows Mr. Patel was aligned with and actively engaged in the conspiracy. Supplier managers and executives frequently requested that Mr. Patel step in as an enforcement measure when other Suppliers were violating the no-poach agreements,

and Mr. Patel deployed his police power to ensure compliance, as discussed in detail below.

**D.    Defendant Mr. Patel, of Defendant Pratt & Whitney, Orchestrated and Enforced the No-Poach Agreement**

75.    Mr. Patel served as an intermediary between QuESt Global, Belcan, Cyient, Parametric, and Agilis Engineering to orchestrate and police the agreement among them.  He enforced the agreement against Suppliers that attempted to solicit or hire other Suppliers' Skilled Aerospace Workers in violation of the agreement.  At times, when infractions of the agreement occurred, a Supplier alerted Mr. Patel to the violation and requested that he assist in preventing or deterring such conduct.  Mr. Patel often responded to these requests by reprimanding the noncompliant Supplier.  Indeed, Mr. Patel explicitly told Supplier managers and executives that Pratt's Suppliers should not be recruiting and hiring each other's Skilled Aerospace Workers.  The Suppliers, in turn, understood that these restrictions applied mutually among the Suppliers themselves.

76.    For example, when conspirators learned of potential breaches of the agreement, they made it their practice to notify Mr. Patel.  In or around February 2015, after Cyient hired one of QuEST's employees, Mr. Edwards e-mailed another Cyient executive stating, "I let Mahesh [Patel] know that this happened – [a]nd we are still looking into how exactly this happened."  Mr. Edwards asked the other Cyient executive, "can you let Mahesh know the actions we're taking to prevent this from happening again?"

77.    The reason such reports were funneled to Mr. Patel is that he took on the role of enforcer.  For example, in or around December 2015, Pratt convened a dinner attended by Mr. Patel and representatives from QuEST, Belcan, and Cyient, including Mr. Wasan, Mr. Edwards, and Co-Conspirator 4.  Individual 1, an executive of Belcan who also attended the dinner, sent an email to Mr. Houghtaling and other Belcan employees summarizing statements made by Mr. Patel during the dinner as he addressed the Supplier representatives.  The e-mail states, "Mahesh did take the stage at the end . . . no poaching of each others' [sic] employees."

78.    In May 2016, a Belcan Vice President—Mr. Houghtaling—was informed by a colleague that "[a]nother employee" had been hired by Parametric to work on outsourcing a

17

project for a non-Pratt company.  The colleague asked Mr. Houghtaling if he "ever discuss[ed] the last one with Mahesh?" Mr. Houghtaling assured the colleague that he had spoken to Mr. Patel and that Mr. Patel had "said he'd talk to [Parametric] about it."  Mr. Houghtaling subsequently emailed Mr. Patel to complain that his company was "losing another employee to [Parametric]," and named the employee.

79.     An internal September 2016 Belcan email indicates that a Belcan executive alerted Mr. Patel to a recent incident of poaching by Parametric Mr. Patel then sent an email to Mr. Prus, referencing Belcan and stating: "<u>You had assured me</u> that [Parametric] will never soliciting [sic] [Pratt's] long term partners [sic] employees ..........Please send me in writing that proper steps has [sic] taken place to curtail this practice."  (Emphasis in original.)  Mr. Prus revealed, in a subsequent email, that he understood Belcan was the source of the complaint: "Belcan is making a big stink right now over any solicitations."  In response to Mr. Patel's reprimand, Mr. Prus e-mailed Individual 5, a Parametric employee, instructing them to "[p]lease stop speaking to any [Belcan] or other [Pratt] supplier companies about transitioning to a [Parametric] Office immediately."  Individual 5 wrote back "[c]onsider it done."

80.     Later, in November 2016, Mr. Prus wrote to another executive at Parametric: "Need to have a conversation with [a manager at Belcan] about them actively recruiting [Parametric] employees.  We do not EVER call their employees."  Later that day, the Parametric executive responded to Mr. Prus: "I talked to him.  He will talk to recruiting . . . ."  Nevertheless, Mr. Prus also involved Mr. Patel, writing him an e-mail to complain about "Belcan actively Recruiting [sic] [Parametric] employees."  Mr. Patel forwarded Mr. Prus's email to Mr. Houghtaling and another Belcan manager, saying "[w]e must not poach each other [sic] partners [sic] employee [sic].  Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt] work."

81.     Similarly, in January 2017, after a Cyient executive sent an e-mail to Mr. Patel complaining of "[Parametric] stealing our people" and naming a Cyient employee who had been offered employment by Parametric, Mr. Patel forwarded the e-mail to Mr. Prus (Parametric),

stating: "Last time we talked you assured me that you will not hire any [Pratt] partners [sic] employee [sic]. This must stop, otherwise others will also start poaching your employees." Mr. Prus subsequently forwarded the e-mail to Individual 5, a Parametric recruiting employee, and said, "Please make sure we stay away from [Belcan], [Cyient], [Agilis] personnel moving forward."

82.     In or around February 2017, Mr. Wasan responded to news that Belcan had made an employment offer to a QuEST engineer, stating in an e-mail: "[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." Approximately four minutes later, Mr. Wasan forwarded the information about Belcan's offer directly to Mr. Patel, adding, "I am very concerned that [Belcan] believes they can hire any of our employees. . . . Could you please stop this person from being hired by [Belcan]?" Individual 2, who had informed Mr. Wasan of Belcan's competitive offer to this engineer, confirmed to the DOJ that part of Mr. Wasan's responsibilities at QuEST Global was to speak with Mr. Patel when other Suppliers violated the no-hire/no-recruit rule. Further, in or around December 2017, a QuEST Vice President e-mailed Mr. Houghtaling to complain about Belcan's employment offers to two QuEST employees in Illinois, stating, "I would like to understand if you are planning to address this immediately, or I will be forced to escalate to our mutual customers." Mr. Harvey immediately responded, stating, "Spot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." Later, he added, speaking to QuEST's management and executive team: "Push hard to have it reversed and consequences for [Belcan]."

83.     Mr. Patel would threaten Suppliers to enforce the no-poach agreement. The DOJ's investigation has revealed a specific example of Mr. Patel making such a threat to a co-conspirator Supplier regarding the no-poach agreement. A June 2018 series of emails reveals communications between and among Mr. Patel and executives from Belcan concerning that company's recent employment offer to an engineer at QuEST Global, about which QuEST Global had complained to Mr. Patel. (*Patel* Affidavit ¶ 33). A recruiter at Belcan explained in an internal email, eventually forwarded to Mr. Houghtaling and other Belcan managers and

executives, that "[QuEST Global] complained to [Pratt] that we are 'stealing' their people, and [Pratt] threatened to pull all POs from [Belcan] if we hire him."  A day later, a Belcan employee e-mailed Mr. Patel and said, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" that engineer.

84.     Additionally, in or around September 2019, after learning that Agilis had hired employees from Cyient, Mr. Edwards (Cyient) e-mailed Mr. O'Neill (Agilis) to request adherence to the hiring and recruiting restrictions agreed upon by the Defendants.  Mr. Edwards stated, "I wanted to ask if your team could refrain from actively recruiting our [Cyient] employees going forward," and assured Mr. O'Neill that, "I flat out ask our teams not to hire people from other [Pratt] suppliers."  Mr. O'Neill assured him, "Our general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt."

### E.     The Express Purpose of the No-Poach Agreement Was to Suppress Compensation to Defendants' Skilled Aerospace Workers

85.     From time to time, Mr. Patel justified the no-hire/no-recruit agreement by appealing to the wage-suppression benefits that it provided to the conspirators, either by referring specifically to wages or salaries or, more broadly, to shared costs or prices.

86.     Mr. Patel repeated or referred to this financial rationale in communications with other Suppliers.  For example, in March 2016, in the course of discussing Mr. Patel's hiring restrictions with an executive of another Supplier, Mr. Prus wrote: "Mahesh says he does not want the salaries to increase."  Similarly, in or around January 2017, after chastising Mr. Prus for Parametric's offer of employment to a Cyient employee, Mr. Patel e-mailed another Parametric employee, copying Mr. Prus, instructing, "Please do not hire any partners [sic] employee [sic], whether they approached or you approached.  That is the only way we can pre[v]ent poaching and price war."

87.     Suppliers, in turn, repeated this rationale back to Mr. Patel at times.  For example, in April 2017, Co-Conspirator 4, a General Manager of QuEST, emailed Mr. Patel and Mr. Wasan to complain that Cyient had hired a QuEST employee, telling him, "This is against our agreements

with our employees and against our known expectations of [Pratt] for the cooperation of the outsource companies."  Co-Conspirator 4 warned Mr. Patel that if such hiring does not stop, it will "drive the price structure up."  Mr. Patel sent an invitation for a "private discussion" the next day in his office with the executives of the two competing Suppliers involved—including Co-Conspirator 4 from QuEST Global, and Mr. Edwards from Cyient—as "required" attendees.

F.     **Defendants Knew Their Conduct Was Unlawful**

88.     Although Plaintiffs' claims do not require proof that Defendants were aware of the unlawfulness of their arrangement, the DOJ's investigation revealed evidence indicating they were well aware but persisted anyway.  At least as early as January 2016, certain managers and executives at Belcan began to discuss the fact that agreements between competitors to restrict recruiting and hiring were unlawful, specifically because they violate antitrust laws.  Early that month, Mr. Houghtaling was forwarded an email with information about a civil lawsuit involving several major companies accused of (as the Belcan employee forwarding the email phrased it) "engaging in illegal anti-poaching agreements . . . the companies involved had promised each other not to actively recruit employees from one another."

89.     A subsequent email shows that, two days later, Mr. Houghtaling worked with Individual 1 to plan a meeting with Mr. Patel.  One of the agenda items for the meeting was "Informal poaching agreement between outsource suppliers.  Recent Apple lawsuit because those agreements are illegal."

90.     The unlawful nature of no-hire/no-recruit agreements was raised to Mr. Patel's attention yet again in February 2017.  As shown in a series of emails, Belcan's Human Resources Director spoke to Mr. Houghtaling about how to respond during an upcoming call with Mr. Patel after a recent allegation that Belcan had hired someone from QuEST Global in violation of the agreement.  She was concerned, given that "there is an anti-trust issue by us turning away people solely based on their previous employer."  In a separate email thread between her and Mr. Houghtaling, among others, Mr. Houghtaling revealed his concern over the lawfulness of this agreement had not disappeared: "[Pratt] (Mahesh Patel) is asking (insisting) that we not interview

anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do."  The next day, Belcan's Human Resources Director reported that she and another Belcan manager "spoke with Mahesh this afternoon.  He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors."

91.    One of the individuals who was part of the email thread referred to in the paragraph above was Individual 6.  Two weeks later, Individual 6 sent an email to Mr. Houghtaling, the Belcan Human Resources Director, and the Vice President of Human Resources.  The sole content of the email was a link to a law firm website discussing a class-action antitrust lawsuit alleging a "conspiracy" between a number of companies who had agreed to "restrict[] recruiting of each other's employees."

92.    Nonetheless, the Belcan and Pratt Defendants continued to participate in and enforce the conspiracy despite their awareness of its illegality.

**G.    Restricting Hiring and Recruiting Between Pratt & Whitney and QuEST**

93.    Evidence shows that, as part of the overall conspiracy, Mr. Patel also agreed with QuEST Global employees to restrict Pratt's hiring and recruiting of engineers and other skilled workers from QuEST Global, through two primary means, discussed in turn below.

**1.    Two-Year Tenure Restriction**

94.    In 2011, Mr. Harvey and Individual 1 lobbied Mr. Patel to agree that Pratt would not hire QuEST Global's employees unless they had worked at QuEST Global for a certain length of time.

95.    In September 2011, Mr. Harvey and Individual 1 attended a dinner with Mr. Patel and a Pratt Vice President to whom Mr. Patel directly reported to discuss that and other issues. Mr. Harvey sent an email to the dinner group the following day, stating, "We truly appreciate and value our strategic relationship.  I thought I would take the lead in summarizing what we discussed last night and proposed next steps . . . "  First on that list was "Personnel Transfers" (in quotations in the original email), which Mr. Harvey described as "the new policy/guidelines" that the Pratt

Vice President had reviewed at the dinner. The new policy related to a "min. 24 months" for such "Personnel Transfers." Mr. Harvey further indicated that Mr. Patel had advised to minimize the written record on that issue: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject."

96.     Beginning in late 2011, from time to time, Mr. Harvey and other managers and executives from QuEST Global communicated with Mr. Patel, and vice versa, in order to reconfirm, maintain, and enforce this agreement and block or attempt to block the recruiting and hiring of certain QuEST Global employees by Pratt. While occasionally these communications went through employees working under Mr. Patel in his outsourcing management group at Pratt, Mr. Patel was the central communicator and decision-maker for Pratt regarding this agreement.

97.     As an example, in October 2012, Individual 1 responded to Mr. Patel by email after receiving a voicemail from Mr. Patel regarding a QuEST Global employee: "[Employee]'s tenure at [QuEST Global] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Pratt] not pursue employment of [him] at this time."

98.     Mr. Patel continued his communications with others at QuEST Global concerning the two-year tenure agreement. As an example, in June 2015, Mr. Patel emailed Mr. Wasan and two other QuEST Global managers, stating that Pratt "is interested in interviewing and hiring" two QuEST Global employees, "[p]lease provide your concurrence." One of the QuEST Global managers responded to Mr. Patel that one of the individuals in question had worked at QuEST Global for four and a half years, and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so [QuEST Global] cannot provide concurrence."

99.     As another example, in April 2017, a QuEST Global manager noted in an internal email to another QuESt Global manager that he had received a notice from Pratt that it wanted to hire a particular QuEST Global employee, but he "wouldn't meet our requirements for two years." Two days later, the same manager emailed Mr. Patel and stated that the employee "does not meet tenure requirements." Mr. Patel then told a Pratt Human Resources employee: "[QuEST Global] will not release him... He has not completed 2 [y]ears as our verbal agreements."

2.    **Hiring Freezes**

100.    In furtherance of the conspiracy, from approximately 2015 through 2017, Mr. Patel and representatives of QuEST Global discussed and agreed upon further restrictions on the hiring and recruiting of QuEST Global employees by Pratt, namely by agreeing upon periods of time— ranging from several months to nearly an entire year (2016)—in which Pratt agreed not to recruit or hire any QuESt Global Skilled Aerospace Workers, with limited exceptions.  These periods of time were often referred to as hiring "freezes" or "moratoria."

101.    Each hiring freeze began by QuESt Global managers and executives lobbying Mr. Patel to restrict or cease hiring from QuEST Global.  As an example, in September 2015, Mr. Patel emailed three QuEST Global employees, including Mr. Wasan, asking for the company's "concurrence" in Pratt & Whitney's hiring of two named QuEST Global engineers.  Mr. Wasan responded to Mr. Patel at length, complaining about the recent increase in Pratt's hiring.  While Mr. Wasan agreed that both of the employees in question "have at least two years [QuEST Global] experience, so [they] meet the 'handshake agreement' level" he stated "[QuEST Global] will not be able to concur with any more hiring of [QuEST Global] employees this year. . . .  All we can do is highlight the problem and ask that [Pratt] support us going forward to prevent further hiring of our resources."  In a follow-up email, Mr. Harvey added, addressing Mr. Patel directly, "Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [QuEST Global] hires for the remainder of the year."

102.    As another example, in January 2016, Mr. Patel and Mr. Wasan were worked together to establish a new hiring freeze for 2016.  Mr. Wasan reported to Co-Conspirator 4 and another colleague, "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring.  Also I am going to tell him that he needs to block" two QuEST Global engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team."

103.    Mr. Patel announced the hiring freezes to other Pratt personnel involved in recruiting and hiring engineers, and directed them to comply with it.  As an example, in an early

September 2017 email to the Vice President of Human Resources-Engineering, Mr. Patel requested that she "direct your HR team not to hire [QuEST Global] outsource resources currently deployed on [Pratt] projects till end of this year….[QuEST Global] senior leadership including CEO has repeatedly raised concerns on [Pratt] hiring [QuEST Global] employees.  We will lift [QuEST Global] hiring restriction from Jan 1, 2018."

104.     The DOJ's investigation revealed a potential financial quandary that QuEST Global and Pratt faced with respect to the latter's hiring from the former: it was difficult for QuEST Global to simultaneously maintain low prices to its customer, Pratt, *and* compete with Pratt's higher wages.  Thus by agreeing to curb Pratt's recruiting and hiring from QuEST Global, when otherwise many QuEST Global engineers would be leaving in favor of higher wages and other benefits that Pratt offered, Mr. Patel helped alleviate upward pressure on costs to both companies.

105.     Consistent with this shared interest, as part of QuEST Global's lobbying of Mr. Patel to agree to the hiring freezes, QuEST Global appealed to the financial benefits that would accrue to both QuEST Global and Pratt if Pratt ceased recruiting and hiring QuEST Global engineers, including by resisting wage increases.  As an example, in June 2017, QuEST Global's President, Mr. Harvey, made a business proposal to the parent company of Pratt, which was forwarded to Mr. Patel.  The proposal requested hiring restrictions between Pratt and QuEST.  As Mr. Harvey explained, it provided a "partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" Raytheon.  In the attached presentation, Mr. Harvey explicitly requested further hiring restrictions between the two companies, given that "We have found that customer hiring of our resources puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."

### H.     Affected Individuals and Anticompetitive Effects Suffered by Class Members

106.     The DOJ has stated that "no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."

107.    While the DOJ investigation has revealed that some Skilled Aerospace Workers were indeed able to obtain new jobs at Pratt or competing Suppliers, and thus not all recruiting and hiring ceased between the co-conspirators during the Class Period, the DOJ investigation has found thus far that the no-hire/no-recruit agreement had a demonstrable impact.  Certain individuals were directly affected, in that they applied for new positions outside their company (or had been identified by the new employer as someone to be recruited for a new position), but were blocked from obtaining that new employment due to the no-hire/no-recruit agreement.  Some witnesses recounted the personal toll that this took on their lives, emotionally, professionally, or financially.  In addition, the DOJ investigation found, in many instances, that witnesses were unaware of the actions taken by Mr. Patel and co-conspirators to block their job applications that have been otherwise revealed by documentary evidence and other witnesses' statements.

108.    In addition, all Defendants' Skilled Aerospace Workers were affected by the no-hire/no-recruit agreement because it suppressed the entire pay structure for skilled labor in this industry, not just the pay of specific employees who would have been hired but-for the agreement, as explained below.

109.    Labor markets are not perfectly competitive.  They are not like commodity markets where market-wide demand and supply tend to determine a single market price.  Defendants do not simply pay a "market wage" for a particular employee, as they might pay a "market price" for a pound of silver on a metals exchange.  Instead, labor market participants determine prices by interacting with each other.  This is particularly true for jobs in which specialized experience or skills are valuable, such as skilled positions in the aerospace engineering industry.  Market "frictions" result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose.  Such market frictions adversely impact competition in labor markets, and generally provide market power to employers. These market frictions and resulting market power are well-recognized in labor economics.

110.    Defendants' conspiracy injured employees with experience or skills in the aerospace engineering industry in part because Defendants are market leaders in their fields. During the Class Period, Pratt & Whitney, QuEST Global, Belcan, Cyient, Agilis, and Parametric were the nation's largest companies in the nation's aerospace-engineering manufacturing and supply space as well as one another's top rivals for labor.

111.    Defendants also are among the largest employers in the aerospace-engineering industry, with a nationwide reach.  For example, Pratt has over 39,000 employees nationwide, QuEST Global has over 12,000, and Belcan has over 10,000.

112.    The specialized knowledge relevant to work in the aerospace-engineering industry is subject to not only market frictions, but also high supply-demand pressures.  There is high demand for and limited supply of employees with experience or skills relevant to aerospace-engineering design, manufacturing, and supply.  Employees within the industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

113.    The importance of relevant industry experience to Defendants is reflected in their job postings.  For example, a job posting for an Engine Health Monitoring Integration Engineer at Pratt emphasizes that "5+ years of relevant experience preferably in the aerospace industry is preferred."  Soliciting employees from other aerospace-engineering industry employers is a particularly efficient and effective method of competing for employees.  Soliciting involves communicating directly—by phone, email, social and electronic networking, or in person—with competitors' employees who have not applied for a job opening.  Such direct solicitation can be done by the soliciting firm's personnel or by outside recruiters.  Firms in the aerospace-engineering industry rely on direct solicitation of employees of other aerospace-engineering firms because those individuals have specialized experience and may not respond to other methods of recruiting.

114.    In a properly functioning and lawfully competitive labor market, aerospace-engineering employers would compete with one another to attract and retain employees for their needs.  This competition among employers for those employees would determine the level of

compensation.  Competition would also improve the employees' ability to negotiate for better salaries and other terms of employment.

115.    In the absence of collusion, companies like Defendants would solicit and hire employees from other companies in the same industry because those employees have training and experience that are lacking in hires from other industries.  Hiring employees from a different industry requires the company to invest significant resources in identifying, assessing, and training those employees.  For these reasons and others, lateral hiring within the aerospace-engineering industry is a key form of competition in this industry.  In this case, Defendants prevented that competition through their illegal conspiracy, apparently concluding that the profits to be made by suppressing wages in the labor market outweighed the benefits to be gained from competing with each other in the labor market.

116.    Competition for workers via lateral hiring has a significant impact on compensation in a number of ways.  First, competition facilitates the flow of information about opportunities and compensation.  For example, employees who are solicited, interviewed, or offered a job by a rival employer gain insight into how other companies value their work and experience, and what compensation and benefits their competitors typically pay or are willing to pay to induce them to leave their current employer.  This information is not otherwise readily available to employees, who generally rely on these encounters and word-of-mouth from peers and colleagues for such information.  Employers, on the other hand, often hire private consulting firms to gather information regarding market compensation rates.  In a labor environment where price discovery is already inhibited, no-poach agreements further restrain employees' access to this crucial information by eliminating or reducing the communications that encourage the flow of information.

117.    Defendants' conspiracy precluded information about pay and benefits from reaching Skilled Aerospace Workers at Defendants' companies.  Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors.  Indeed, empirical economic research confirms that employees

28

who change jobs voluntarily typically have faster wage growth than those who remain in the same job. These employees also could have shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels. Among other things, Defendants refrained from informing employees or others who were targets of the conspiracy of the fact of the conspiracy and acted to conceal the fact of the conspiracy by giving pretextual explanations for hiring or compensation decisions, and omitting that such decisions were made on the basis of the illegal agreements, not because of market conditions or because of the worth or value of employees. These acts precluded employees from possessing highly relevant information.

118.    Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention. Absent appropriate compensation, employees are more likely to seek better compensation elsewhere, be receptive to recruiting by competitors, limit their productivity, and undermine morale. Once an employee has received an offer from another company, the employer may have to increase compensation to retain that employee, and increase compensation for other employees as well to maintain internal equity. In a competitive labor market, such preventive retention measures thus lead to increased compensation for employees. But in the aero-engineering industry, Defendants' conspiracy substantially spared them from taking such measures, lowering employee pay.

119.    Third, Defendants, like other sophisticated companies, maintained internal compensation systems and developed compensation structures that preserved relatively stable relationships between the pay of their employees. The effect of such systems is that an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees. Distortions to the labor market's competitive process, such as the distortions caused by Defendants' no-poach agreements, suppressed the pay of all employees who shared common pay structures, not just those who proactively sought to work for another employer.

Moreover, because the pay rates for jobs within pay structures were tied together, the compensation of all employees was affected by Defendants' no-poach agreements.

120.    To maintain productivity and morale and to retain employees, in the absence of a prior agreement, employers such as Defendants would also consider the perceived fairness of their compensation systems.  Defendants thus had an incentive to ensure that their employees felt that their compensation was fair based on broad comparisons across job descriptions and titles within the company and as compared to other companies in the industry.

121.    What constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field.  For example, employees generally would not consider it fair for there to be pay differentials for workers doing the same work at the same level at the same company based solely on the fact that some of these employees received an outside solicitation or offer of alternate employment.

122.    Fairness concerns often involve both "internal equity" and "external equity." "Internal equity" depends on the extent to which employees perceive pay levels to be fair and objective compared to other employees *within* the same company.  "External equity" depends on the perception of the fairness of pay levels compared to similar employees *outside* the company. Defendants' pay structures were designed, constructed, and maintained to accomplish both internal and external equity goals, and the illegal agreement allowed Defendants to keep the wage rates artificially low.

123.    Companies foster both internal and external equity by maintaining formal compensations systems that restrict discretionary pay decisions and focus on more objective criteria such as job descriptions and classifications, wage levels for equivalent jobs in the labor market, pay differentials based on experience and levels of responsibility, and other factors affecting the perceived fairness of the compensation system.  In sum, pay systems adjust pay levels across job titles and pools of employees to maintain internal and external equity to better foster morale and motivate employees across a company's labor force.  Because of these systems, the pay of one employee always bears a relationship to the pay of other employees.

30

124.    These pay systems are systematically monitored and adjusted from the top down by senior management, with regular company-wide reviews and assessments.

125.    Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.

126.    Due to internal and external equity considerations, increasing the pay of one employee in order to retain that employee leads to pay raises not only for those who perform similar work (and thus are within the same pay bands or grades), but also for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees.  Conversely, a no-poach agreement suppresses compensation not only for employees who would have received competitive offers, but also for other employees as well.  These systematic effects occur both at the same time, through firm-wide pay adjustments and reviews, and over time, as pay structures adjust to account for internal and external equity.

127.    Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets.  The conspiracy suppressed the compensation of all skilled employees, not just particular individuals who otherwise would have been solicited or sought to change employers.  The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on Defendants' employees by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

I.    **The Compensation Structures for Defendants' Unionized Employees Contributed to the Common Impact of Defendants' Conspiracy**

128.    The International Association of Machinists and Aerospace Workers ("IAM") represents about 2,600 Pratt workers.  These unionized employees are skilled machinists and mechanics and are subject to a collective bargaining agreement ("CBA").

129.    The CBA itself provided a wage structure.  Collective bargaining agreements set minimum compensation ranges for employees with similar job titles, classifications, levels of

experience or time worked for the company.  The agreements also set compensation differentials based on varying positions, levels of experience, or time worked for the company.

130.    The IAM CBA adopted in 2018 set wage schedules by job category for each year from 2019 to 2023.  An example of the 2019 wage schedule is displayed below:

**SCHEDULE A**
**Effective January 14, 2019**

| Labor Grade | Standard Rate* | Maximum Rate |
|---|---|---|
| 11 | $11.78 | $13.95 |
| 10 | $17.87 | $20.13 |
| 9 | $20.34 | $22.60 |
| 8 | $21.98 | $24.25 |
| 7 | $24.09 | $26.34 |
| 6 | $26.38 | $28.63 |
| 5 | $29.06 | $31.33 |
| 4 | $31.90 | $34.28 |
| 3 | $34.88 | $37.23 |
| 2 | $38.17 | $40.59 |
| 1 | $41.65 | $44.14 |
| 0 | $44.13 | $46.69 |

131.    Article X of the IAM CBA explains how wages progress beyond the minimum rates set in the aforementioned wage schedule based on each worker's tenure.  That is because the value to a firm of a high-performing employee is higher than these minimums.  Attempts by another employer to hire a high-performing worker (or to a worker that is otherwise in high demand) recognize his or her higher value.  Such hiring attempts create a bidding war that allows that employee to negotiate his or her compensation much closer to his or her value.  Furthermore, if the high-performing employee increases the top of the scale for his or her particular position, given the internal equity and the compensation structure factors referenced above, it would likely lead to higher pay for other employees as well.

132.    One of the primary purposes of a wage structure such as the wage classifications in the CBA is to maintain internal equity among employees.  That is, as explained above, Defendants paid employees who worked in similar jobs similarly.  Defendants used formal compensation structures, such as the CBA for unionized employees and centrally adopted compensation plans for other employees, to ensure that employees were paid similarly for comparable work, and to establish relatively fixed pay grades as between groups of employees.

32

**J.**    **Plaintiffs' Claims Are Timely Because Defendants Fraudulently Concealed the Conspiracy**

133.    Until December 10, 2021, when the DOJ publicly announced the indictment of Mr. Patel, Plaintiffs and other Class members did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements.

134.    As the DOJ alleges, Defendants and their co-conspirators took steps to conceal the existence and operation of the conspiracy, including by:

a.    Minimizing written discussions about the agreement and dissemination thereof;

b.    Agreeing that the conspiratorial agreement would remain an unwritten understanding and not reflected in master terms agreements or other formal, written agreements between Mr. Pratt and co-conspirators;

c.    Holding and participating in meetings and discussions about the agreement in private, with limited audiences; and

d.    Providing false and misleading information to skilled employees regarding the existence of the agreement and the workers' ability to obtain employment at other co-conspirators' companies, including by communicating that employment at those companies was unavailable because of noncompete agreements (between the employers and employees) rather than the conspiratorial arrangement.

135.    For example, in a September 2011 e-mail from Mr. Harvey to Mr. Patel and co-conspirators, Mr. Harvey stated, "Following Mahesh's previous counsel, I am not going into detail in writing" about the no-poach agreement.

136.    Similarly, in a January 2015 statement by a QuEST manager to Mr. Harvey and two other QuEST executives regarding a recent discussion with Mr. Houghtaling about ceasing poaching between QuEST and Belcan, the QuEST manager stated: "While I wanted you to be

informed, I would rather not have any other folks know where this info came from.  I request that this email not be forwarded."

137.    In April 2017, Mr. Patel sent an invitation for a "private discussion" in his office to two QuEST managers, as well as Mr. Edwards and another manager from Cyient, following a complaint of poaching that QuEST made to Mr. Patel about Cyient.

138.    Defendants did not publicize their no-poach agreements, did not inform job applicants about the conspiracy, and acted in a manner deliberately designed to avoid detection of the conspiracy.  For example, the agreements among Defendants were primarily memorialized in private company emails, and deliberately not memorialized in a written agreement or contract, or other writing likely to become widely available.  Knowledge of the agreements was closely held by executives and recruiters of the Defendant companies, who relied on direct and non- public communications with one another to manage and enforce the no-poach agreements, including in-person discussions, telephone conversations, and private email communications.  None of the relevant communications alleged herein were made public until the *Patel* Affidavit was unveiled.

139.    Additionally, rather than disclose their no-poach agreements, Defendants devised internal procedures to identify affected applicants, and gave false and pretextual explanations for hiring and compensation decisions that in fact were made pursuant to Defendants' unlawful agreement.

140.    The written Codes of Conduct for multiple Defendants mislead Skilled Aerospace Workers and the public by touting their adherence to the antitrust laws.  For example:

      a.    Raytheon Technologies Corporation's Code of Conduct states: "Anti-competitive practices. . . . distort the marketplace. Collusion between competitors—to fix prices, carve up markets, or rig bids, for instance—leads to excessive prices and substandard products and services. . . . . No matter where we do business, anti-competitive activities are always a violation of our values."

b.    Raytheon Technologies Corporation's Supplier Code of Conduct states: "You must not engage in any anti-competitive conduct for any reason whatsoever, . . . . You must never . . . fix prices, allocate customers or markets, or . . . ."

c.    Cyient's Code of Conduct states that: "Directors and Senior Management personnel shall avoid actions that could reasonably be construed as being anti-competitive, monopolistic or otherwise contrary to laws governing competitive practices in the marketplace, including antitrust laws."

d.    QuEST's Code of Conduct states: "QuEST abides by antitrust and competition laws" and "anti-competitive activity will not be tolerated."

141.    Until recently, Plaintiffs and Class members did not and could not discover and did not and could not know of facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their engineers and skilled employees.

142.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this action individually and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

All Skilled Aerospace Workers employed by one or more Defendants in the United States at any time from 2011 through 2019 ("Class Period").

Excluded from the Class are: Defendants' board members, senior corporate officers and personnel in the human resources and recruiting, as well as individually-named Defendants Patel, Harvey, Edwards, Wasan, Prus, O'Neill, and Houghtaling.  Also excluded are all judges assigned to hear or adjudicate any aspect of this litigation and their judicial staff.

144.    Plaintiffs reserve the right to amend the Class definition, define subclasses, and expand or narrow the proposed Class based on information obtained in discovery and expert analysis of such information.

145.    There are thousands of members of the Class as described above, the exact number and their identities being known by Defendants, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

146.    The Class is precisely ascertainable from Defendants' records.

147.    Plaintiffs' claims are typical of the claims of the proposed Class as they arise out of the same course of Defendants' conduct and the same legal theories.

148.    Plaintiffs will fairly and adequately represent the interests of the proposed Class and has no conflict with the interests of the proposed Class.

149.    There are numerous questions of law and fact common to each Class member, including, but not limited to:

      a.    whether Defendants and their co-conspirators agreed not to solicit or hire each other's Skilled Aerospace Workers;

      b.    whether such agreements were *per se* violations of the Sherman Act;

      c.    whether Defendants have fraudulently concealed their misconduct;

      d.    whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for Plaintiffs and the proposed Class;

      e.    whether Plaintiffs and the Class suffered antitrust injury as a result of Defendants' agreements;

      f.    the type and measure of damages suffered by Plaintiffs and the Class; and

      g.    the nature and scope of injunctive relief necessary to restore a competitive market.

150.    During the Class Period, Plaintiffs Messers. Brooks-Bey and Brizeus were employed by Defendant QuEST.  Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

36

151.    Plaintiffs are members of the Class, have claims that are typical of the claims of the Class, and will fairly and adequately protect the interests of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

152.    The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

153.    Defendants have acted on grounds generally applicable to the proposed Class, thereby making final injunctive relief appropriate with respect to the proposed Class as a whole.

154.    A class action is superior to any other means of resolving this litigation.  Separate actions by individual Class members would be inefficient and would create the risk of inconsistent or varying judgments.  There will be no material difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

155.    Plaintiffs realleges and incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

156.    Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's employees, thereby fixing and suppressing Class members' compensation.

157.    Defendants' conspiracy included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiffs' and the Class's compensation at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for employees.

37

158.     Defendants' combinations and conspiracy injured Plaintiffs and other members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

159.     Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

160.     Defendants' conduct is ongoing, continues to create immediate irreparable harm, and will continue to do so in the future if not enjoined.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully requests that:

a.      The Court certify this lawsuit as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

b.      The Court declare, adjudge, and/or decree that the conduct alleged herein is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      Plaintiffs and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law;

d.      The Court enter an injunction enjoining Defendants from enforcing the unlawful conspiracy or entering into similar agreements going forward; and

e.      The Court award such other and further relief as the Court may deem just and proper.

///

///

///

///

///

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury on all issues so triable.

Dated:  December 28, 2021

/s/  Mathew P. Jasinski
Mathew P. Jasinski (ct27520)
**MOTLEY RICE LLC**
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Telephone: (860) 218-2725
Facsimile:  (860) 882-1682
mjasinski@motleyrice.com

Christopher T. Micheletti (*pro hac vice* forthcoming)
Heather T. Rankie (*pro hac vice* forthcoming)
Anjalee M. Behti (*pro hac vice* forthcoming)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile:  (415) 693-0770
cmicheletti@zelle.com
hrankie@zelle.com
abehti@zelle.com

*Counsel for Individual and Representative Plaintiffs*
*Tarrique Brooks-Bey and Wadner Brizeus*